Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000555
29-JAN-2016
08:42 AM

NO. CAAP-12-0000555

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

JOEL SHAWN RAND, Plaintiff-Appellee, v.
KEHAULANI MUNOS RAND, Defendant-Appellant

APPEAL FROM THE FAMILY COURT OF THE SECOND CIRCUIT
(FC-D NO. 11-1-0371)

SUMMARY DISPOSITION ORDER
(By: Nakamura, Chief Judge, Leonard and Reifurth, JJ.)

Defendant-Appellant Kehaulani Munos Rand (**Kehau**)
appeals from the Family Court of the Second Circuit's (**Family
Court's**) Divorce Judgment and Exhibit "1" filed June 5, 2012
(**Divorce Judgment**), and challenges the Family Court's: October
19, 2011 Order on Plaintiff's Motion to Set Filed September 7,
2011 (**Order on Motion to Set**); December 1, 2011 Order Denying
Kehaulani Rand's Motion to Continue Trial and Granting
Defendant's Motion for a Pre-Decree Relief Against Waste (**Order
Denying Motion to Continue**); December 1, 2011 Order Re: (1)
Further Pre-Trial/Settlement Conference and (2) Joel Rand's
Motion for a Protective Order Filed 11/9/11 (**Order Re: Further
Pre-Trial/Settlement Conference**); January 24, 2012 Order Denying

in Part and Granting in Part Defendant Kehau Rand's Motion to Compel Discovery Filed on January 6, 2012 (**Order Granting in Part Kehau's Motion to Compel Discovery**); and March 1, 2012 Sua Sponte Order Re: Order of the Court on February 21, 2012 Regarding Updated Financials as of February 21, 2012 Including Back Up Documents of the Financials (**Sua Sponte Order**).[1]

Kehau raises the following points of error on appeal:[2]

(1)   The Family Court erred by including the following statement in the Divorce Judgment:   "Each party acknowledges that he or she has voluntarily executed this Judgment with sufficient knowledge of the facts and the law, and that this Judgment is fair and reasonable[;]"

(2)   The Family Court abused its discretion in entering its Order on Motion to Set over Kehau's objections, denying her various motions for continuance, and declining to order Morgan Stanley Smith Barney (**MSSB**) to produce the personnel file of Kehau's ex-husband, Plaintiff-Appellee Joel Shawn Rand (**Joel**);

(3)   The Family Court erred by allowing Joel to call unnamed rebuttal experts;

(4)   The Family Court erred in refusing to divide Joel's stock options; the Divorce Judgment made no allocation of the stock options and awarded Joel all property in his individual

---

[1]   The Honorable Michelle Drewyer presided over the trial, Divorce Judgment, Order on Motion to Set, and the Sua Sponte Order.   Judge Drewyer also entered the court's subsequent Findings of Fact and Conclusions of Law. The Honorable Keith E. Tanaka presided over the Order Denying Motion to Continue, and the Order Re: Further Pre-Trial/Settlement Conference.   The Honorable Lloyd Poelman presided over the Order Denying Kehau's Motion to Compel Discovery.

[2]   For ease of discussion, points of error regarding the equalization payment have been consolidated and some points have been reordered.

name and the Property Division Chart (**PDC**) did not list the options;

(5) The Family Court abused its discretion in rejecting both appraisers' valuation of the condo at $600,000 and instead adopting a $680,000 valuation;

(6) The Family Court abused its discretion by denying Kehau any attorney fees;

(7) The Family Court erred in failing to consider that Joel did not comply with New York Stock Exchange (**NYSE**) Rule 405 and therefore should have been charged with substantial losses in his stock portfolio;

(8) The Family Court erred by ordering Kehau to pay Joel a $45,380.89 in equalization payment by ignoring values as of the date of the conclusion of the evidentiary portion of the trial (**DOCOEPOT**); further, the Family Court erred in calculating the equalization payment by failing to take into account that: (a) Kehau incurred unnecessary discovery expenses because Joel concealed certain documents from her; (b) the values of certain assets changed after Joel's January 3, 2012 PDC was prepared but before the DOCOEPOT; (c) Kehau's legal expenses totaled at least $60,000; (d) the Retention Agreement offset the Retention Note (and, it appears, that the Longevity Note was also offset by the Longevity Bonus); (e) the marital estate should not have been charged with the unaccrued interest on the notes, both because "[i]nterest accrues in arrears," and because MSSB would reimburse Joel for interest payments; (f) if interest was to be charged, it should be discounted to present value; (g) the marital estate

should not have been charged with the future taxes on the bonus payments from MSSB;

(9) The Family Court erred by refusing to include Joel's benefits under MSSB's Former Financial Advisor Program (**FFAP**) as a marital asset on the basis that he was not 55-years-old or fully retired; and

(10) The Family Court abused its discretion by ordering Joel to pay Kehau only $1,000 a month for one year in alimony.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, as well as the relevant statutory and case law, we resolve Kehau's contentions as follows:

(1) Although we agree that Kehau did not "voluntarily execute" the Divorce Judgment or (voluntarily) acknowledge that it was "fair and reasonable," Kehau has not contended that this error affected her substantial rights. See Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006); see also Hawai'i Family Court Rules (**HFCR**) Rule 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."). Accordingly, although this language should not be included in the Family Court's amended judgment on remand, we decline to vacate the court's judgment on this ground.

(2) After a September 28, 2011 hearing, the Family Court entered its Order on Motion to Set on October 19, 2011.

This order set trial on an expedited basis, to be held on November 17 and 18, 2011. However, Kehau subsequently filed a motion for continuance, her motion was granted on December 1, 2011, and trial was set to begin on January 19, 2012. Even assuming, *arguendo*, that the court abused its discretion in entering the October 19, 2011 Order on Motion to Set, Kehau has not provided any argument as to why this error was not cured when the court granted her subsequent motion for continuance. In addition, Kehau was able to present testimony by a financial expert, which was a significant argument made for the continuance, as well as evidence regarding Joel's $217,382 Retention Agreement and the FFAP which she appears to allege was provided too close to the trial date. Kehau makes no argument as to why the court's ruling (on her mid-trial motion) that it would be too burdensome to require MSSB to then produce Joel's personnel file was in error. Nor does Kehau challenge or otherwise address the Family Court's Conclusion of Law (**COL**) 9, which states:

> The record reflects that there was ample time for [Kehau] to conduct appropriate discovery, that she did conduct discovery, that she did receive discovery amounting to several thousands of pages, and that she listed more than 250 documents on her trial exhibit list, although she opted only to introduce 35 exhibits. Under those circumstances, it is fair and equitable to conclude that [Kehau] had a full and fair opportunity to conduct the necessary discovery.

For these reasons, we conclude that this point of error is without merit.

(3) Kehau's primary arguments appear to be that the Family Court abused its discretion in allowing Joel to call previously unidentified expert witnesses in rebuttal because Joel

was, in effect, holding back testimony that should have been offered in his case-in-chief and because Kehau had no discovery or reports for this expert testimony. It is clear, however, that this expert testimony was offered in rebuttal to expert testimony that had been first disclosed by Kehau on the day before trial. Under the facts and circumstances of this case, the Family Court did not abuse its discretion in rejecting Kehau's claim that Joel's rebuttal testimony was improper. Although Kehau had just received key MSSB documents, Kehau had not issued a subpoena covering these documents from MSSB until December 12, 2011, which was after the discovery cutoff.[3] The authorities cited by Kehau for the proposition that the Family Court abused its discretion in allowing the rebuttal expert testimony without written reports do not support that proposition. We conclude that the Family Court exercised its discretion within the parameters set forth in Nelson v. Univ. of Haw., 97 Hawai'i 376, 384-86, 38 P.3d 95, 103-05 (2001), and did not err in allowing the rebuttal expert testimony.

(4) The Divorce Judgment did not mention Joel's MSSB stock options, but awarded each party his or her own personal property, including any accounts they held in their own names.

---

[3] Kehau also states that Joel failed to disclose the FFAP retirement plan, but does not point to any evidence that Joel was a participant in that plan; the only evidence in the record supports the Family Court's finding that he did not. Rather, Kehau contends that Joel might participate in a FFAP in the future, and therefore it should be considered a marital asset.

In its Findings of Fact (**FOFs**) and COLs filed on June 27, 2012, however, the court stated in FOFs 57 and 58 that:

57. All stock options earned by [Joel] after the date of marriage, June 21, 2003, shall be split equally between the parties. All revenue from these options, if any, shall be divided equally by the parties[.]

58. In accordance with all of the foregoing, a Divorce Judgment providing as follows shall therefore enter. The Divorce Judgment attached as Exhibit "2" shall be adopted as the final Divorce Judgment in this matter.

Kehau alleges that the Divorce Judgment's failure to mention Joel's stock options and statement that each party would receive their own personal property and accounts was in error.

Joel counters that Kehau's allegation of error is frivolous because FOF 57 divided the stock options. However, insofar as the court's Exhibit 2 attached to its FOFs and COLs (the Divorce Judgment) was ordered to be the final divorce decree, the failure to address the stock options while ordering that each party keep their own personal property and accounts appears to have effectively negated FOF 57. Thus, the failure to include a specific disposition of Joel's stock options was in error. On remand, the court is directed to amend the Divorce Judgment to include its determination that Joel's stock options earned after the Date of Marriage (**DOM**) are to be divided equally between Joel and Kehau.

(5) The Family Court did not err in adopting $680,000 as the fair market value (**FMV**) of the condominium as of the DOM, notwithstanding conflicting opinions as to value, based largely on the actual sales price paid for the property within

7

approximately eight months of the DOM. See, e.g., Baker v. Bielski, 124 Hawai'i 455, 466-67, 248 P.3d 221, 232-33 (App. 2011) ("We define the FMV as being the amount at which an item would change hands from a willing seller to a willing buyer, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts," and holding that the actual sales price "clearly represented the amount at which the item changed hands from a willing seller to a willing buyer") (citation omitted); see also Teller v. Teller, 99 Hawai'i 101, 115, 53 P.3d 240, 254 (2002) ("[I]t [is] within the family court's discretion to review the full record to determine an equitable value [of an asset].").

(6)   Kehau argues that the Family Court abused its discretion in failing to order Joel to pay a portion of her attorney's fees in light of the vastly disproportional financial abilities of the parties (apparently Kehau was earning $13/hour and Joel was earning $20,000/month) and the character of the litigation.   In response, Joel appears to acknowledge that his income significantly exceeds Kehau's, but contends that he should not have to pay any of Kehau's attorney's fees because her attorney engaged in vexatious and frivolous conduct.   Without reaching the issue of whether all of Kehau's attorney's fees have been reasonably incurred, it appears that this latter characterization is inconsistent with the record on appeal. Although we did not conclude that the Family Court abused its discretion in expediting the trial or disallowing further mid-

trial discovery from MSSB, the acceleration of the trial timeline and pretrial dates, as well as the complicated nature of Joel's compensation, seem to have required significant efforts by Kehau's counsel in order to protect her interests, including the necessity of seeking continuance of the trial and formal discovery to get relevant, undisclosed, information concerning Joel's income/assets, such as the bonus retention agreements between Joel and MSSB. Without explanation, the Family Court completely disregarded or summarily dismissed the huge disparity in the parties' respective financial abilities, and did not address the reasonableness of the fees incurred in light of the necessities of this case. See, e.g., Farias v. Farias, 58 Haw. 227, 233, 566 P.2d 1104, 1109 (1977). Accordingly, we vacate the Family Court's COL concluding that it was fair and equitable for each party to bear his or her own attorney's fees and costs and remand for further consideration of this issue in light of Hawaii Revised Statutes (**HRS**) §§ 580-9 (2006) and 580-47(f) (2006), and applicable case law.

(7) At trial, Kehau elicited testimony from her expert, Jeremiah Savage, regarding Joel's obligations under NYSE Rule 405[4] or the "prudent man rule." Savage was asked: "What

---

[4] NYSE Rule 405 states, in part:

Every member organization is required through a principal executive or a person or persons designated under the provisions of Rule 3110(a) to

(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account

(continued...)

were the obligations of Joel Rand in respect of Kehau's portion of [Joel's] 401(k) on October, 2010?"  He replied:

> The moment that he contemplated divorce, then he can no longer, as a financial advisor to his client or his wife, look in her best interest because, actually, their retirement, because she was unemployed when he was saving during the times that she was unemployed for their benefit in the future.  There was an innate conflict of interest at that point and he should have severed the relationship and another financial advisor should have took over and sat down with Kehau and asked what her risk tolerance was.

Savage also testified that from the fourth quarter of 2010 to the third quarter of 2011, Joel's 401(k) decreased in value by over a hundred thousand dollars, that Kehau's share of that loss was inconsistent with her risk tolerance, and that there were ways to protect Kehau's interest in Joel's 401(k) such as by "put[ting] it in cash."

In its FOFs and COLs, the Family Court did not mention Joel's obligations under NYSE Rule 405 or charge him with the reduction in the value of his 401(k).  On appeal, Kehau argues:

> Under Higashi and in light of his obligations under NYSE Rule 405, Joel's failure to protect Kehau's interest in the marital assets during the time of divorce warrants that [Joel bear] the losses during the time of divorce. . . . This can be achieved by using on the PDC the valuation of the funds as of October 2010 and not as of the date of the divorce for the accounts which decreased during the time of divorce:
>
> - Account MSSB xxx749, item 4.1 of the PDC, be valued at $193,491.81 as stated by Joel in his financial statement dated 12/21/10. . . .

---

[4] (...continued)
> accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.
>
> . . . .

NEW YORK STOCK EXCHANGE, INC., NEW YORK STOCK EXCHANGE RULES AND CONSTITUTION, RULE 405. DILIGENCE AS TO ACCOUNTS (2014) available at 1995 WL 17845826.

- Joel's Deferred Comp., item 4.7 of the PDC, be valued at $92,634, as stated by Joel in his financial statement dated 12/21/10. . . .
- Joel's 401K, item 8.2 of the PDC, be valued at $630,235.28 as stated by Joel in his financial statement dated 12/21/10[.]

In Higashi v. Higashi, the case cited by Kehau, this court held that:

> A reduction of the dollar value of the marital estate chargeable to a divorcing party occurs when, during the time of the divorce, a party's action or inaction caused a reduction of the dollar value of the marital estate under such circumstances that he or she equitably should be charged with having received the dollar value of the reduction. . . . By definition a reduction of the value of the marital estate during the marriage, but prior to the time of the divorce, is not a chargeable reduction.
>
> When the [family] court decides that a divorcing party chargeably reduced the dollar value of the marital estate, the court must add the dollar amount of that chargeable reduction to the dollar value of the marital estate and treat that dollar amount as having been awarded to the divorcing party who caused that chargeable reduction.

106 Hawai'i 228, 241-42, 103 P.3d 388, 401-02 (App. 2004) reconsideration denied, 106 Hawai'i 268, 103 P.3d 428 (App. 2004), cert. denied, 106 Hawai'i 296, 103 P.3d 965 (2005). Under Higashi,

> The issue . . . is not simply whether a reduction in the value of the marital estate can be attributed to the "action or inaction" of one of the parties - it is whether when considering all of the circumstances it would be equitable to charge the entirety of the loss to one or the other party.

Kekumu v. Kekumu, No. 30017, 2013 WL 3156023 at *1 (App. June 20, 2013) (SDO).

Although we are unable to discern the Family Court's reasoning, considering the Family Court's broad discretion in determining what is and what is not equitable, on the record before us, we cannot conclude that the Family Court abused its discretion by refusing to charge Joel with the reductions in the

11

values of any of his stock portfolios under <u>Higashi</u>. The Family Court was entitled to disregard Savage's opinion as to how Joel should have handled his 401(k). It is unclear from the record, for example, whether and how another financial advisor might have in effect partitioned the 401(k) account, which was associated with Joel's employment, in such a way that would have carried out what Savage suggested, while looking out for Joel's interests as well, or why cash would be an appropriate investment for a retirement account, which is not intended to address immediate needs, but is intended to grow over time to help satisfy retirement needs. It is well-settled that the determination of the credibility and weight of the evidence is within the province of the trial court. <u>In re Doe</u>, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001). In addition, Kehau contends that Joel should be charged with reductions in his MSSB account ending in 749, and his deferred compensation plan, as well as his 401(k), but Kehau has not pointed to any testimony regarding Joel's failure to manage any other accounts, besides his 401(k), under NYSE Rule 405.

Thus, we conclude that the Family Court did not abuse its discretion by refusing to charge Joel with the reduction in the value of his stock portfolios.

(8) The Family Court ordered Kehau to pay Joel $45,380.89 "as an equalization payment for the division of parties['] marital estate." In its FOFs, the court determined that "[Joel] will have $133,908.49 less assets than he had on the

12

Date of Marriage as a result of this divorce. [Kehau] will have $43,146.71 less assets than she had on the Date of Marriage. (Exhibit "1")." Exhibit "1" is the property division chart (**PDC**) incorporated in the Divorce Judgment.

Kehau contends, *inter alia*, that the court erred by failing to assess the value of the marital assets as of the DOCOEPOT[5], using a January 3, 2012 cutoff instead. She argues that "Joel's desire to use a 1/3/12 cutoff instead of DOCOEPOT is inconsistent with the partnership model[,]" and cites Myers v. Myers, 70 Haw. 143, 154, 764 P.2d 1237, 1244 (1988) for the proposition that "a final division of marital property can be decreed only when the partnership is dissolved." As Kehau also argues, from January 3, 2012 to the February 21, 2012 DOCOEPOT, the overall stock market rose significantly[6] and Morgan Stanley's stock rose over 27%. In addition, there is evidence in the record that, during this period, MSSB awarded 2011 bonuses, made 401(k) contributions for 2011 income, and paid certain moneys used to reduce the waivable loans related to MSSB's structured bonuses.

Although the Family Court, on February 17, 2012, ordered both parties to submit financial statements updated to the DOCOEPOT, the court later struck Kehau's updated financial

---

[5] The DOCOEPOT in this case was the last day of trial, February 21, 2012.

[6] Whether measured by either the total U.S. stock market or large cap (S&P 500) U.S. stocks, it appears that the overall market rose well over 8% between January 3, 2012 and February 21, 2012.

13

statement (instead relying on her earlier statements that reflected lower values for the volatile financial assets) and, after Joel failed to submit updated statements, the court *sua sponte* reversed its prior order and ruled that "[n]o updated financials including any back up documents shall be filed."

The impact of the use of the January 3, 2012 date instead of the DOCOEPOT appears to be substantial and prejudicial to Kehau. Generally stated, Kehau shared in the significant 2011 losses in the parties' financial assets, but not their substantial recovery in early 2012, prior to the DOCOEPOT. As the supreme court has consistently held, for example in <u>Myers</u>, the DOCOEPOT is the date on which marital assets should be valued for property division in a divorce. The financial assets appear to have consisted largely of publicly traded stocks for which valuations are readily accessible as of any particular date (especially for a professional financial adviser like Joel). In addition, the exclusion of various other forms of Joel's compensation post-January 3, 2012, but pre-DOCOEPOT, is inconsistent with Hawai'i's partnership model of marriage and property distribution in divorce.

Even assuming that the Family Court properly struck Kehau's updated financials and considered Joel's voluntary interim support payments a valid and reasonable consideration to depart from the partnership model of property division, relying on Joel's out-of-date statements without requiring updates was in error.

14

Also, as mentioned above, the PDC attached to the Divorce Judgment shows that Joel was indebted to MSSB under two promissory notes marked as items 11.1 and 11.2 on the PDC, which shows the value of the promissory note marked 11.1 (which was the Retention Note) as $214,532.00 and the value of the note marked 11.2 (the Longevity Note) as $25,229.31. The Family Court found that the two notes were part of a bonus structure in which MSSB paid monies to Joel in lump sums on the condition that Joel execute promissory notes in the amount of those sums. Joel signed the Retention Note on March 30, 2009 and was paid $217,382.10 on January 26, 2010. He signed the Longevity Note on January 15, 2009 and received $31,376.81 on that date. Each year that Joel remained employed with MSSB, he would pay back a portion of the promissory notes with interest, MSSB would then pay him back that amount, which would be reflected as income on his W-2, and Joel would then owe taxes on the repayment from MSSB. The purpose of this structure was to relieve the tax burden on the recipient of the bonus. The Retention Note was to be paid over the course of nine years while the Longevity Note was to be paid back over eight years. The court also found that:

> [t]he receipt of the monies was conditioned on [Joel] being retained by MSSB. . . . "if someone were to be terminated with the firm, leave the firm or retire, the note would be accelerated" and the remaining principal plus interest due back in full. The amount due would be the remaining balance . . . .

Kehau argues that the Family Court erred by charging the marital estate with the debts without any offsetting of the repayments MSSB agreed to make under the bonus agreements. We

15

agree. While the debts under the notes were marital debts, the corresponding repayments by MSSB should also have been considered as part of the marital estate. Baker, 124 Hawai'i at 464, 248 P.3d at 230 (the Family Court did not err in using the tax debt attributed to the husband to calculate the equalization payment even though the husband voluntarily assumed the debt because "[t]he tax debt is not [husband's] separate property because it was acquired during the marriage."). However, repayments by MSSB under the Retention and the Longevity Agreements should also have been categorized as part of the marital property. We have previously held that "the phrase 'estate of the parties' as it is used in HRS § 580-47 means anything of present or prospective value[.]" Linson v. Linson, 1 Haw. App. 272, 278, 618 P.2d 748, 751 (1980). In Linson, we held that a spouse's nonvested retirement benefit, which was contingent on him remaining in military service for two more years, was part of the marital estate. Id. at 273, 278, 618 P.2d at 749, 751.

Joel's right to receive the repayments is provided for in the Retention Agreement and Longevity Agreement. These payments are not speculative because they are based on contractual obligations. Further, although the payments are contingent on certain requirements, such as Joel remaining employed with MSSB on the date that each payment is to be made, as we held in Linson, the fact that certain contingencies must be met before a contractual benefit vests does not remove the benefit from the definition of marital property. Thus, the

16

marital estate should have been credited for the repayments provided for in both the Retention and the Longevity Agreements.

Furthermore, it was inequitable to refuse to credit the estate with the future payments that were meant to pay off the debts under the notes. Under statute, the Family Court is directed to exercise general equity powers. HRS § 571-3 (2006). "[E]quity regards the substance rather than the form. . . . Equity goes behind the form of the transaction in order to give effect to the intention of the parties . . . ." Schrader v. Benton, 2 Haw. App. 564, 566, 635 P.2d 562, 564 (1981) (quoting Lord v. Lord, 35 Haw. 26, 39 (Haw. Terr. 1939)) (internal quotation marks omitted). The promissory notes were part of an overall structure intended to pay Joel the entire amount of the Retention and Longevity Bonuses up front while ensuring that he would not have to pay taxes on those lump sums. Instead, Joel would have to pay taxes on the repayments he received over the years under the corresponding bonus agreements. In its FOFs, the court wrote:

> 41. The monies [under the Retention Bonus] were paid conditioned upon the Financial Advisor executing a Promissory Note and "paid in the form of a loan because taxes had to be paid" over time. The taxes on the bonus money received were not paid up front, on the date of receipt of the entire bonus, to relieve the recipients of the impact of paying all of the resulting taxes in the year the money was received. The tax obligation was extended through the nine year [Retention] Note.
>
> . . . .
>
> 48. [Joel] received another bonus in 2009 called a Longevity Bonus. . . . The Longevity Bonus has the same structure as the Retention Bonus, except it was spread over eight (8) years.

(Emphasis added). Acknowledging that the intention of Joel and MSSB in executing the promissory notes and bonus agreements was merely to lessen the tax burden on Joel, it was inequitable to simply treat the promissory notes as bona fide marital debts, putting the form of the transaction over the intention of the parties.

The court's decision to assess the notes as debts but not to credit the marital estate with any of the subsequent repayments was also inequitable because of the resulting burden on Kehau. The PDC utilized by the court treated the debts under the promissory notes as partnership losses. The equalization payment ordered from Kehau would have the effect of lessening Joel's purported losses while increasing Kehau's losses, so that they would have the same amount of loss. However, post-divorce, Joel's "losses" under the notes would be offset by subsequent repayments from MSSB, while Kehau would not be able to share in any of these future repayments. Thus, Joel will be able to offset his "losses" from two sources, Kehau and MSSB, while Kehau would have to shoulder an equalization payment that was substantial ($45,380.89), especially compared to her meager income, which the court found to be only $2,338 per month.

Therefore, as the Family Court's decision not to offset the promissory notes with any of the corresponding payments under the bonus agreements ran counter to the principles of equity, it abused its discretion by doing so. Carroll v. Nagatori-Carroll, 90 Hawai'i 376, 381, 978 P.2d 814, 819 (1999) ("Under the abuse of

discretion standard of review, the appellate court is not authorized to disturb the family court's decision unless . . . the family court failed to exercise its equitable discretion[.]") (citations and brackets omitted).

For these reasons, we vacate the Family Court's determination that Kehau must pay a $45,380.89 equalization payment to Joel. The Family Court's directions in FOFs 46 and 48, that if Kehau disputes that the notes are debts, she should pay half of each installment under the notes each year and be responsible for one half of the resulting taxes on the repayments from MSSB, are vacated as well.

(9) The Family Court's COL 8 reads, in part:

E. Retirement Accounts.

> The parties shall be entitled to keep their own retirement accounts, and the Court, in calculating an equalization payment, has considered the values of those accounts as set forth in the parties' financial statements filed on January 3, 2012, even though [Kehau] did not introduce any evidence at trial to support the values she assigned to her accounts in any of her financial statements.

> MSSB FFAP. [Kehau] has claimed that [Joel] has a present or future interest in the MSSB Former Financial Advisor Program ("FFAP") as a nonqualified deferred compensation plan. [Kehau] has not demonstrated that [Joel] now has, or will have in the future, any such interest in an MSSB FFAP, and the evidence shows that [Joel] is not presently eligible for such a program, has not signed an agreement to participate in such a program, and that the program is subject to modification by MSSB at any time, including by complete termination of the program. Therefore, [Kehau] is not entitled to an order granting [Kehau] a present or future interest in an MSSB FFAP.

Kehau contends that the FFAP should have been included as a marital asset and should have been divided pursuant to the

19

Linson formula.[7]  We disagree.  Kehau cites Linson, 1 Haw. App. 272, 618 P.2d 748, Stouffer v. Stouffer, 10 Haw. App. 267, 867 P.2d 226 (1994), and Baker, 124 Hawai'i 455, 248 P.3d 221, for the proposition that benefits receivable under the FFAP should be considered marital property.  However, none of these cases stand for the proposition that marital assets include retirement benefits under a plan which a spouse has not elected to participate in and which is not guaranteed to be available in the future.  There was no evidence that Joel had elected to participate in or had any right to receive benefits from the FFAP, either at the time of trial or in the future.  MSSB had the right to modify or terminate its compensation plans and programs at any time.  At the DOCOEPOT, there was no agreement between Joel and MSSB which would entitle Joel to benefits under the FFAP.  Thus, the Family Court did not err by refusing to award Kehau any future benefits that Joel might later acquire under the FFAP.

(10)  Under HRS § 580-47, the Family Court may compel either party in a divorce to provide for the support and maintenance of the other party as shall appear just and equitable.  When ordering spousal support and maintenance under

---

[7]     The "Linson formula," although not actually included in the Linson opinion, has been adopted by this court in calculating the amount of retirement benefits to be awarded to the non-owner party after divorce.  Under the Linson formula, "the non-owner party is awarded one-half of a percentage of the owner's retirement.  The formula for determining the percentage is to divide the number of years credited to retirement during the marriage by the total number of years credited to retirement."  Donnelly v. Donnelly, 98 Hawai'i 280, 281, 47 P.3d 747, 748 (App. 2002) (citations and internal quotation marks omitted).

20

HRS § 580-47, the court is required to consider certain statutory factors.[8] In the present case, the Family Court concluded in COL 4:

> Considering the factors set forth in HRS § 580-47, the Court concludes that it is fair and equitable that [Joel] shall pay [Kehau] alimony of $1,000.00 per month for the period of one (1) year. The Court concludes that since [Kehau] worked for the Postal Service for seventeen (17) years and was making $17.00 per hour when she terminated that employment and that she has been attending college classes since at least Spring 2000, according to [Joel's] Trial Exhibit "54"[9], it would be equitable to expect that [Kehau] should be able to rehabilitate herself for wage-earning purposes within a year.

---

[8] These factors are:

(1) Financial resources of the parties;

(2) Ability of the party seeking support and maintenance to meet his or her needs independently;

(3) Duration of the marriage;

(4) Standard of living established during the marriage;

(5) Age of the parties;

(6) Physical and emotional condition of the parties;

(7) Usual occupation of the parties during the marriage;

(8) Vocational skills and employability of the party seeking support and maintenance;

(9) Needs of the parties;

(10) Custodial and child support responsibilities;

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13) Probable duration of the need of the party seeking support and maintenance.

HRS § 580-47(a).

[9] Joel's Exhibit P-54 is a copy of Kehau's University of Hawai'i System transcript.

21

On appeal, Kehau argues that the court abused its discretion by awarding her only $1,000 per month in alimony while ordering her to pay about $45,000 as an equalization payment. She alleges that the court erred in failing to consider her ineligibility for Social Security disability benefits, how low her potential future Supplemental Security Income (**SSI**) payments will be under her current earning rate, the fact that her financial plan was that Joel would "take care of her," the fact that "Joel had the opportunity to contribute to her IRA as a spousal IRA but did not[,]" and the fact that her budget left her with a shortfall of $2,934 a month.

With respect to Kehau's assertion that the court erred by failing to consider how low her future SSI payments will be if she retires at the ages of sixty-two, sixty-seven, or seventy, we note that it is well-settled that in awarding spousal support, the Family Court's decision must be based "upon a realistic appraisal of the situation of the parties at the time of the divorce." Jacoby v. Jacoby, 134 Hawai'i 431, 446, 341 P.3d 1231, 1246 (App. 2014) (citation and internal quotation marks omitted). At the time of the Divorce Judgment, Kehau was 49 years old. "HRS § 580-47(a) does not require the Family Court to predict changes in the parties' income that will not occur for over ten years." Id. Thus, the court did not err in failing to consider Kehau's potential future SSI benefits.

Nor did the court err in failing to consider Kehau's ineligibility for Social Security disability benefits. Kehau's

22

potential need for disability payments in the future had no bearing on her situation at the time of the divorce. Likewise, Kehau's prior plan to rely on Joel and the fact that Joel had not contributed to her IRA were not factors demonstrating that the Family Court abused its discretion.

However, we agree with Kehau's contention that the court erred in failing to consider Kehau's January 18, 2012 budget. Kehau submitted several versions of her budget after divorce. The first was her Income and Expense Statement filed on September 21, 2011, the second, her Income and Expense Statement filed on January 3, 2012, and the last, her Income and Expense Statement filed on January 18, 2012 which was entered into evidence as Kehau's Exhibit D-233. Exhibit D-233 showed that Kehau's monthly budget left a shortfall of $2,934. Kehau testified at trial that the January 18th Statement was more current than the January 3rd Statement. During her testimony, Kehau went over which costs in her budget were estimates and how she arrived at those estimates.

In its FOF 55, the court determined that "[w]ith the exception of her Income and Expense Statement filed January 3, 2012, [Kehau] has not provided a budget or other prepared document identifying her future needs. The January 3, 2012 Expense Statement was not substantiated by [Kehau]." Given that Kehau's January 18, 2012 Income and Expense Statement, which included different values than the January 3, 2012 Statement, was entered into evidence, the court's finding that Kehau did not

23

provide any other budget was clearly erroneous. Further, the court should have considered the January 18, 2012 Statement as it appeared to be relevant to several of the HRS § 580-47(a) factors, in particular, the "[f]inancial resources of the parties," Kehau's ability to "meet . . . her needs independently," and the "needs of the parties." This of course does not mean that the court was obligated to accept the budget as accurate, as it could have ultimately determined that the budget was not entirely credible. However, insofar as the court's alimony award was based on a clearly erroneous finding, we conclude that its decision was in error. Jou v. Schmidt, 129 Hawai'i 270, 276, 298 P.3d 1034, 1040 (2013) ("The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.") (citation omitted). Thus, we vacate the court's alimony award. We note, however, that the issue on remand should be limited to whether or not $1,000 per month was, as Kehau claims, insufficient. Joel has not appealed the court's award of alimony and has not made any argument on appeal that Kehau is not entitled to alimony of at least $1,000 per month for a year. In fact, Joel's answering brief states that "the Family Court did not abuse its discretion by correctly deciding the alimony issue." Additionally, because Kehau did not challenge the court's finding that she should be able to rehabilitate herself for wage-earning purposes within a year, there is no basis for the court to award alimony for more than a year.

24

To the extent and for the reasons set forth above, the Family Court's June 5, 2012 Divorce Judgment is vacated in part, affirmed in all other respects, and remanded for further proceedings consistent with this Order.

DATED: Honolulu, Hawaii, January 29, 2016.

On the briefs:

Joy Mademba-Sy Yanagida,
Jean-Claude Mademba-Sy,
(Yanagida & Associates),
for Defendant-Appellant.

R. Steven Geshell,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge